**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

QUENTIN KYLE GREEN,                                                      PETITIONER

v.                                          4:20CV001449-LPR-JTK

DEXTER PAYNE                                                            RESPONDENT

## PROPOSED FINDINGS AND RECOMMENDATIONS

### INSTRUCTIONS

The following recommended disposition has been sent to United States District Judge Lee P. Rudofsky. Any party may file written objections to all or part of this Recommendation.  If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objections; and (2) be received by the Clerk of this Court within fourteen (14) days of this Recommendation.  By not objecting, you may waive the right to appeal questions of fact.

### DISPOSITION

## I.    Introduction

On May 18, 2016, a criminal information filed in the Circuit Court of Miller County, Arkansas, charged Quention Kyle Green ("Petitioner") with one count of rape and one count of sexual assault in the second degree.  State v. Green, 46CR16-388; (Doc. No. 7-7 at 6).  Ultimately, a jury convicted Petitioner of the charges.  (Doc. No. 7-2 at 33, 34).  Attorney Joe Tyler ("Tyler") represented Plaintiff during the criminal proceedings.

Petitioner appealed.  (Doc. No. 7-3).  His convictions were upheld  by the Arkansas Court of Appeals in a January 24, 2018 opinion.  Green v. State, 2018 Ark. App. 38 (2018); (Doc. No. 7-5).  Petitioner then unsuccessfully sought relief under Rule 37 of the Arkansas Rules of Criminal Procedure.  (Doc. No. 7-7 at 8, 101).  On February 19, 2020, the Arkansas Court of Appeals

affirmed the denial of Rule 37 relief.  <u>Green v. State</u>, 2020 Ark. App. 130, 1–5 (2020).  The Arkansas Supreme Court denied Petitioner's petition for review on April 23, 2020.  (Doc. No. 7-14).

Petitioner now seeks relief pursuant to 28 U.S.C. §2254.   (Doc. No. 1).  He argues that Tyler violated the Arkansas Rules of Professional Conduct along with Petitioner's rights under the Sixth and Fourteenth Amendments.  Petitioner's claims are based largely on the fact that Tyler's law partner Craig Barrett ("Barrett") was romantically involved with the prosecuting attorney who prosecuted the criminal case against Petitioner.

Petitioner raises the following five claims in his § 2254 petition: (1) the circuit court erred in refusing to hold that defense counsel had a conflict of interest not remedied by a valid waiver; (2) counsel was ineffective by his failure to object to inadmissible testimony from Melanie Halbrook of the Child Advocacy Center; (3) counsel was ineffective by his failure to object to testimony of witnesses quoting the accuser and not seeking an instruction that their testimony was not being admitted for the truth of the matter asserted; (4) counsel was ineffective for failure to object to improper impeachment of a defense witness; and (5) counsel was ineffective by failure to present or seek to present testimony concerning the accuser's source or inspiration to make the original claim of abuse.

## II.    Background

Relevant portions of the underlying proceedings are provided below.

### A.    The Charges Against Petitioner and the Ensuing Jury Trial

Petitioner was accused of the rape and second-degree sexual assault of his 10-year-old stepdaughter, K.B.  K.B. told her mother of the abuse; her mother in turn confronted Petitioner. (Doc. No. 7 at 2).   When K.B.'s mother later talked to K.B. to verify the abuse, the mother

explained that Petitioner would go to jail and K.B.'s younger sister would be without her father. (Id.).  K.B. then recanted her allegation; the recantation was videoed by attorney Michael Peek "Peek."  (Id.).

Several years later, K.B. reiterated the allegations of abuse.  (Id.).  K.B. explained in an interview with Melanie Halbrook ("Halbrook"), a forensic interviewer with the Child Advocacy Center ("CAC"), that she recanted her allegations because her mother did not believe her.  (Id.). K.B. also reported that Petitioner had continued the abuse.  (Id.).  K.B.'s renewed allegations led to the rape and second degree sexual assault charges.

The Arkansas Court of Appeals accurately described the evidence adduced at Petitioner's trial as follows:

> Lyndi Green, appellant's former wife, testified that she has four children. K.B. is one of her middle children. Ms. Green testified that when K.B. was ten years old, K.B. told her that appellant, K.B.'s stepfather at the time, had touched her inappropriately under her pajamas and under her panties. Appellant denied the allegations after Ms. Green confronted him about the incident. Ms. Green testified that on that same night that she confronted appellant, appellant indicated that he thought about killing himself. After that incident, Ms. Green had K.B. stay with her grandparents and took K.B. to see a counselor. A few days later and after further conversations with Ms. Green about the ramifications of the allegations, K.B. recanted her story, apologized to appellant, and returned home. Additionally, the family went to an attorney, Michael Peek, and a video was taken of K.B. explaining that she had recanted her story. A few years later, K.B. told Ms. Green that she had lied when she had recanted her story. Additionally, K.B. told her biological father about the incident, and it was reported to law enforcement.
>
> Officer Patsy DeHart testified that she was the investigator assigned to the case against appellant in 2016. Officer DeHart testified that law enforcement had received a call on the Arkansas State Police hotline with the allegations. Arkansas State Police Crimes Against Children Division took the initial report, and it was screened by the Arkansas Department of Human Services (DHS). Officer DeHart contacted the Children's Advocacy Center (CAC) and arranged for K.B. to be interviewed.
>
> Melanie Halbrook, a forensic interviewer at the CAC in Benton County, testified that she had interviewed K.B. K.B. was fifteen years old at the time of the interview. Ms. Halbrook testified that during the interview, K.B. disclosed that appellant had

digitally penetrated her when she was ten or eleven years old. Although K.B. reported that the first time it happened when she was about ten years old, K.B. indicated that appellant had continued to inappropriately touch her on subsequent occasions. K.B. additionally disclosed to her that she had falsely recanted her story after the first incident because her mother did not believe her. Ms. Halbrook testified that over eighty-five percent of children will recant their statements when there is a lack of maternal support and the abuse is by a male caretaker. Ms. Halbrook further testified that of the eighty-five percent of children who recant, about ninety-three percent of them will later reaffirm those allegations. Regarding the video that was taken in Mr. Peek's office, Ms. Halbrook testified that the interview was not conducted under the protocols used by her office. She testified that Mr. Peek used a lot of direct questions, forced multiple-choice answers, legal jargon, and hypothetical questions, all of which she avoids. Ms. Halbrook testified that after her interview, she opined that K.B.'s statement and body language were consistent with sexual abuse. Videos of both interviews were played for the jury.

Ky.B. testified that she is K.B.'s older sister. According to Ky.B., when K.B. was ten or eleven years old, K.B. told her about an incident in which appellant had come into K.B.'s room one night and inappropriately touched K.B.'s "girl parts." Ky.B. testified that her sister was "hysterically crying, like bawling her eyes out" when she told her about the incident.

D.H., K.B.'s friend, testified that in January or February 2016, she attended an overnight church retreat with K.B. That night, K.B. told D.H., along with several other girls in attendance, that appellant had inappropriately touched her when she was approximately ten years old. D.H. described K.B. as emotionally weak, hanging her head, and crying some while making the statement.

K.B. testified and described in detail two incidents in which appellant inappropriately touched her. K.B. testified that on at least one occasion, appellant digitally penetrated her vagina. K.B. admitted that she recanted her story after telling her mother about one of the incidents and that she had lied during the video that was recorded in Mr. Peek's office. She explained that her mother did not believe her story at that time and that she felt the counselor also did not believe her. In 2016, after Ms. Green and appellant had divorced in 2015, K.B. attended a church retreat. K.B. testified that she told her friends at the event that appellant had, in fact, inappropriately touched her despite her prior statements to the contrary. Afterward, she told Ms. Green and her biological father that she had not made up the story about the incidents.

Appellant testified and denied the allegations. Appellant indicated that when K.B. made the initial allegations, she was angry with her mother and wanted to live with her biological father. He did not know why she realleged the allegations. Appellant further denied that he had ever threatened suicide to Ms. Green.

Mr. Peek testified that he had interviewed K.B. after appellant and Ms. Green hired him. At that time, K.B. had initially accused appellant of inappropriately touching

her and then recanted her story. Mr. Peek explained that it was not his duty to find out the truth but to protect his client who paid him. Mr. Peek testified that he does not necessarily model his interview on CAC's protocols. However, he does try to avoid leading questions on all material parts and felt that he did so during K.B.'s interview.

Appellant finally offered two character witnesses on his behalf. Appellant's grandmother testified that appellant had never touched anyone inappropriately to her knowledge or do anything that would cause her concern. Furthermore, appellant's pastor testified that he did not have any concerns about appellant being around either of his children or his grandchildren.

After all evidence had been presented, including the videos from both interviews, the jury found appellant guilty of rape and sexual assault in the second degree, and appellant was sentenced to serve consecutively 300 months and 60 months in the Arkansas Department of Correction, respectively.

Green v. State, 2020 Ark. App. 130, at 1–5 (2020).

### B.   Direct Appeal

On direct appeal, Petitioner did not contest the sufficiency of the evidence.  Green v. State, 2018 Ark. App. 38, at 5 (2018).  Petitioner instead argued that the trial court abused its discretion in refusing to allow Tyler to question Halbrook about testimony in an unrelated rape case in which the defendant was allegedly acquitted.  The Arkansas Court of Appeals did not reach the issue because Petitioner failed to proffer at trial evidence from which the Court of Appeals could make a determination on the issue.  Id. at 9.

### C.   Rule 37 Proceedings

Petitioner was represented in his Rule 37 proceedings by Mr. Jeff Rozenzweig, who also represents Petitioner in this habeas action.  In seeking Rule 37 relief, Petitioner made multiple arguments:  (1) the circuit court erred in refusing to hold that defense counsel had a conflict of interest not remedied by a valid waiver; (2) counsel was ineffective by his failure to object to inadmissible testimony from Melanie Halbrook of the Child Advocacy Center; (3) counsel was ineffective by his failure to object to testimony of witnesses quoting the accuser and not seeking

an instruction that their testimony was not being admitted for the truth of the matter asserted; (4) counsel was ineffective for failure to object to improper impeachment of a defense witness; and (5) counsel was ineffective by failure to present or seek to present testimony concerning the accuser's source or inspiration to make the original claim of abuse.[1]

       1.    <u>Petitioner's Conflict of Interest Claim</u>.

In the Rule 37 proceedings, Petitioner argued conflict of interest. As written in the Petition for Relief Under Rule 37, "[t]he cause and prejudice test of *Strickland v. Washington*, 466 U.S. 668 (1984), is the test for ineffectiveness and adopted as the state test under Rule 37." (Doc. No. 7-7 at 8). While Petitioner mentioned the Sixth and Fourteenth Amendments, his argument was focused on violations of the Arkansas Rules of Professional Conduct. (<u>Id</u>. at 9-10). The Rule 37 Petition reads, in part:

> [Petitioner] was represented by Joe Tyler of the law firm of Barrett and Tyler. Tyler's law partner, Craig (Shorty) Barrett, was in an extremely close personal relationship with the elected prosecuting attorney, Stephanie Potter Black.
>
> Had Barrett personally undertaken representation of Petitioner, this would have violated Rule 1.7(a)(2) of the Arkansas Rules of Professional Conduct.
>
> > (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if: (1) the representation of one client will be directly adverse to another client; or (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or **by a personal interest of the lawyer**[.]
>
> The participation of Tyler without Barrett could not and did not cure the problem. Rule 1.10(a) of the Arkansas Rules of Professional Conduct provides that:

---

[1] In his Rule 37 Petition, Petitioner raised an argument in connection with the seating arrangements and architecture of the courtroom. Because Petitioner did not bring that argument in this habeas action (see Doc. No. 1), the Court will not consider this issue.

(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.9 or 3.7, unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm.

Although the disqualification of Barrett involved a personal interest, waiver could only be accomplished by "informed consent, confirmed in writing" as required by Rule 1.7(b)(4). Furthermore, the relationship was sufficiently close that there was a significant risk of materially limiting the representation. The risk indeed was demonstrated by the egregious ineffectiveness described below.

Tyler orally disclosed to Petitioner that Barrett and Black were in a relationship that would prohibit them from litigating against each other. Tyler did not obtain a waiver on the conflict nor did he discuss the Rule 1.10 requirement. Also, he said that Black would not personally prosecute the case, which turned out not to be true. Moreover, considering the fact that Ms. Black was the elected prosecuting attorney, she could have been walled off from the case.

This conflict violated Petitioner's right to counsel under Sixth and Fourteenth Amendments and Article 2 sec. 10 of the Arkansas Constitution. Petitioner also here states that had he had this information, he would not have retained Tyler or his firm.

(Id. at 9-10).

Judge David Laser held a hearing on the matter on November 19, 2018. (Id. at 124-236). During the hearing, Tyler testified extensively as to the decisions he made in representing Petitioner in the criminal proceedings, including at trial. Among other things, Tyler testified that he did not see any conflict in his representation of Petitioner. (Id. at 134:18-22). Tyler said he became aware that Ms. Black would participate at trial probably a month before the fact, and told Petitioner of the development. (Doc. No. 7-7 at 135:2-136:6). Tyler had "gone against [Ms. Black] before," so to him this was no different. (Id. at 136:19-20). Tyler testified that he had prosecuted "probably a hundred and fifty, two hundred" cases with Ms. Black representing the state when Barrett and Ms. Black were either dating or married. (Id. at 137:14-17). During the course of the representation, nothing "[came] up that made this relationship germane or affect the issues in

7

[Tyler's] case with [Tyler's] defendant client at all[.]"  (Id. at 137:18-22).  Tyler testified that he "never felt either that [he] had a favorable or unfavorable edge as relates to [the relationship], just like any other prosecutor."  (Id. at 138:2-5).

In denying Rule 37 relief, Judge Laser found that Tyler had no personal relationship with Ms. Black.  (Id. at 103).  Judge Laser further found that Barrett's conflict "did not impart to [] Tyler." (Doc. No. 7-7 at 103).   Judge Laser also noted Tyler's testimony that he discussed with Petitioner Tyler's association with Barrett.  (Id. at 103, 105).   Judge Laser pointed out that "[c]ontrary to the allegations in his Petition wherein he states he would not have retained Mr. Tyler, neither the defendant nor his family sought representation elsewhere and continued to employ Mr. Tyler as the attorney for the defendant."  (Id. at 105).

### 2.   Failure to Object to Inadmissible Testimony From Melanie Halbrook

Petitioner argued that because the accuser had not yet testified at the time of Melanie Halbrook's testimony, a Child Advocacy Center interview with the accuser was "inadmissible as a violation of rights of confrontation under the Sixth and Fourteenth Amendments and Article 2 Sec. 10 of the Arkansas Constitution and *Crawford v. Washington*, 541 U.S. 36 (2004)."  (Id. at 11).  Petitioner further argued that Tyler was ineffective in stipulating that Halbrook was an expert, and in failing to object to improper profile evidence.  (Id.).

Judge Laser determined Tyler's treatment of Halbrook to be trial strategy.  (Id. at 105-08).

### 3.   Failure to Object to Testimony Without a Limiting Instruction

Petitioner explained that the prosecutor called two outcry witnesses.  (Doc. No. 7-7 at 15). Both witnesses testified before the accuser did, and claimed the accuser told them she had been abused by Petitioner.  (Id.).   Petitioner argued that to the extent the statements were not offered for the truth of the matter asserted, Tyler was ineffective for failing to obtain a limiting instruction.

Again, Judge Laser found Tyler's treatment of the witnesses and their statements to be trial strategy.  (Id. at 109-110).

### 4.    Failure to Object to Improper Impeachment of Defense Witness

Petitioner argued that Tyler was Ineffective for failing to object when the prosecuting attorney impeached defense witness Peek.  (Id. at 15).  Peek took the recantation statement from the accuser.  The prosecuting attorney asserted that attorneys were mandated reporters, but that Peek had not reported allegations of abuse.  (Id.).  Petitioner maintained that despite the prosecutor's statement having no basis in law, Tyler failed to object to the improper impeachment.

Judge Laser found relief unwarranted because there was no evidence any different outcome would have been reached.  (Id. at 111-112).

### 5.    Failure to Present Testimony Concerning Accuser's Source

Petitioner maintained Tyler was ineffective for not delving into the origin or the accuser's claim of abuse.  The accuser made her claim shortly after a contemporary had come to live with the accuser; the contemporary had accused her stepfather of sexual abuse.  (Doc. No. 7-7 at 16).  Tyler missed his opportunity to ask the accuser about the origin of her allegations, which, according to Petitioner, was ineffective assistance.  Judge Laser again found relief unwarranted based on Tyler's decision being trial strategy.  (Id. at 113).

Judge Laser found none of Petitioner's arguments warranted relief.

### D.    Appeal of Rule 37 Proceedings

On appeal, Petitioner pursued the same arguments listed above.  The Court of Appeals, applying the Strickland standard, affirmed the trial court's decision.

With respect to the alleged conflict of interest, the Court of appeals, like Judge Laser, found that no conflict existed.  The Court of Appeals noted that the trial court heard Tyler's testimony

and Petitioner's arguments, but was not convinced of any conflict under Rule 1.10(a).  Petitioner v. State, 2020 Ark. App. 130, at 13.  The Court considered Tyler's testimony that "he did not feel that his law partner's relationship with Ms. Black gave him either a favorable or an unfavorable edge."  Id.  Tyler further testified that he did not think his partner's "personal interest with Ms. Black limited [Tyler's] representation of [Petitioner] and Mr. Barrett was not involved in appellant's defense in any manner."  Id.  The Court of Appeals found no clear error on this point.

The Court of Appeals concluded that Tyler's arguments regarding Halbrook's testimony fell under trial strategy, and were not grounds for finding ineffective assistance of counsel.  Id. at 15.  Similarly, the Court of Appeals found Tyler's failure to object to testimony quoting the accuser or to seek a limiting instruction, and his failure to present testimony regarding the accuser's source or inspiration for her claims of abuse, were also issue of trial strategy.

Lastly, the Court of Appeals found that even if Tyler was deficient in failing to object to the improper impeachment of Peek, Petitioner "could not show that there is a reasonable probability that the fact-finder's decision would have been different absent counsel's error on such a relatively minor point."  Id. at 19.  The Court of Appeals affirmed on this point because Petitioner could not show prejudice.

## III.   Petitioner's Habeas Claims

Petitioner's claims were decided by the state court on the merits.  Under the Antiterrorism and Effective Death Penalty Act of 1996, federal habeas courts are restricted to a "limited and deferential review of underlying state court decisions."  Sera v. Norris, 400 F.3d 538, 542 (8th Cir. 2005); Ryan v. Clarke, 387 F.3d 785, 790 (8th Cir. 2004).  Federal courts are prohibited from granting habeas relief on a claim that was adjudicated on the merits in state court, unless the adjudication:

     (1)      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

     (2)      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see also <u>Rompilla v. Beard</u>, 545 U.S. 374, 380 (2005).

A state court decision is "contrary to" federal law if the state court arrives "at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the United States Supreme] Court has on a set of materially indistinguishable facts." 28 U.S.C. § 2254(d)(1); <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000). A state court unreasonably applies federal law when the state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at 413. A state court decision is based on an "unreasonable determination of the facts" only if clear and convincing evidence shows "that the state court's presumptively correct factual findings do not enjoy support in the record." <u>Lomholt v. Iowa</u>, 327 F.3d 748, 752 (8th Cir. 2003); see also 28 U.S.C. § 2254(e)(1) (a state court's factual finding shall be presumed to be correct, and the applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence). When considering ineffective assistance claims, courts must be cognizant that "the question is not whether counsel's actions were reasonable . . . [but] whether there is any reasonable disagreement that counsel satisfied *Strickland's* deferential standard." <u>Abernathy v. Hobbs</u>, 748 F.3d 813, 817 (8th Cir. 2014).

Each issue Petitioner raised is addressed separately below.

### A.    Conflict of Interest

Petitioner argues ineffective assistance of counsel brought about by a conflict of interest. When a Sixth Amendment right to counsel exists, "there is a correlative right to representation that

is free from conflicts of interest." Wood v. Georgia, 450 U.S. 261, 271 (1981).  Petitioner focuses his argument largely around purported violations of the Arkansas Rules of Professional Conduct.

"[B]reach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance to counsel." Nix v. Whiteside, 475 U.S. 157, 165 (1986). Rather, ineffective assistance of counsel claims generally are analyzed under the Strickland standard.  Under Strickland, a petitioner must demonstrate that counsel's performance was deficient, and that the deficient performance prejudiced the defense.  Strickland v. Washington, 466 U.S. 668 (1984);  Winfield v. Roper, 460 F.3d 1026, 1033, 1039 (8th Cir. 2006).

But when a petitioner alleges ineffective assistance based on conflict of interest, the less demanding standards of Holloway v. Arkansas, 435 U.S. 475 (1978) and Cuyler v. Sullivan, 446 U.S. 335 (1980) may apply instead.  Mickens v. Taylor, 535 U.S. 162, 168-69 (2002).  Holloway and Sullivan both involved a conflict of interest that arose from representation of multiple clients. Multiple representation, however, is not at issue here.  Neither the United States Supreme Court nor the Court of Appeals for the Eighth Circuit have expressly extended the more lenient standards available under Holloway and Cuyler to cases in which the conflict did not arise from multiple representation.  Williams v. Ludwick, 761 F.3d 841, 846 (8th Cir. 2014); U.S. v. Sharp, 879 F.3d 327, 333 (8th Cir. 2018).

In Williams v. Ludwick, the Court of Appeals for the Eighth Circuit assumed, without deciding, that Cuyler applied to a conflict of interest not arising out of multiple representation. 761 F.3d at 846.  The Court explained that to succeed under Cuyler, "'a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance.'"  Id. (citing Cuyler, 446 U.S. at 350).  "To prove a conflict produced an adverse effect [under *Cuyler*], a defendant must identify a plausible alternative defense strategy or tactic that defense counsel might have

pursued, show that the alternate strategy was objectively reasonable under the facts of the case, and establish that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict." Id. (citing Morelos v. United States, 709 F.3d 1246, 1252 (8th Cir. 2013)).  In contrast to Strickland, when "a defendant ... shows that a conflict of interest actually affected the adequacy of his representation, [he] need not demonstrate prejudice in order to obtain relief." Cuyler v. Sullivan, 446 U.S. 335, 348-49 (1980).   Ultimately, in Ludwick the Court of Appeals affirmed the trial court's denial of relief under both Strickland and Cuyler.  Ludwick, 761 F.3d at 846-47.  Here, as in Ludwick, Petitioner's claims also fail under either standard.

Petitioner alleges that the circuit court erred in refusing to hold that defense counsel had a conflict of interest not remedied by a valid waiver.  Petitioner alleges Tyler's actions violated his Sixth Amendment rights, along with Rule 1.7(a)(2) of the Arkansas Rules of Professional Conduct. (Doc. No. 1 at 6).   Petitioner describes the conflict through the following example: "Tyler was in the position of (i) not antagonizing the prosecutor and probably his law partner as well, or (ii) propounding proper objections to the evidence in this case."  (Id. at 5).

During the Rule 37 hearing, Tyler testified that he had been with law firm of Barrett and Tyler, LLP since 2008.  (Doc. No. 7-7 at 130:6-11).  Tyler further testified that his partner, Barrett, was romantically involved with the elected prosecutor, Ms. Black.  (Id. at 130:12-131:10).  Tyler discussed with Petitioner, his client, or his client's family, that Barrett and Ms. Black were dating, and that Tyler did not see that as a conflict.  (Id. at 131:4-132:1).  Tyler explained that Barrett "had decided to refrain from . . . practicing criminal defense in [Ms. Black's] circuit to avoid any appearance of impropriety."  (Id. at 131:22-132:1).

In deciding to take Petitioner's case, Tyler consulted Rules 1.71 and 1.10 of the Arkansas Rules of Professional Conduct, but did not obtain a written waiver of conflict from Petitioner.  (Id.

at 132:13-22).  Tyler believed that, pursuant to Rule 1.10, if a conflict is a "personal conflict," then no waiver was needed.  (Id. at 133:1-3).  In the early stages of Petitioner's criminal case, Tyler told Petitioner that Tyler did not think Ms. Black would be participating in the case against Petitioner.  (Doc. No. 7-7 at 134:23-135:13.)  Ms. Black, however, would participate, as Tyler learned about a month before trial and disclosed to Petitioner.  (Id. at 135:14-136:12).

When asked if Barrett's personal romantic interest in Ms. Black caused Tyler any concern, Tyler responded: "It didn't cause me concern.  I had gone against her before so I mean to me it wasn't any different."  (Id. at 136:13-20).  Tyler also testified that during the time Barrett and Ms. Black were either dating or married, Tyler worked as defense counsel in cases with Ms. Black in one hundred and fifty to two hundred cases.  (Id. at 137:11-17).  Judge Laser inquired of Tyler whether "[d]uring the course of that representation did at any time anything come up that made this relationship germane or affect the issues in your case with your defendant client at all?"  (Id. at 137:18-21.)  Tyler's response was "[n]ot at all, Your Honor."  (Id. at 137:22).  Judge Laser continued his questioning:  "Not anything that even brought you thinking about well there's something going on here because of this relationship?"  (Doc. No. 7-7 at 137:23-25).  Tyler responded, "No, Your Honor."  (Id. at 138:1).  Judge Laser persisted:  "You never felt either that you had a favorable or unfavorable edge as relates to that, just like any other prosecutor?"  (Id. at 138:2-4).  Tyler answered, "That's correct, I never felt that way."  (Id. at 138:5).

In its written order denying Rule 37 relief, the trial court cited the Strickland standard (Id. at 102-03).  The court found Barrett clearly had a conflict, but the conflict did not impart to Tyler, because Tyler had no personal interest that would create a conflict.  (Id. at 104).  As such, the court wrote, no written waiver and consent was required.  (Doc. No. 7-7 at 104).  The court looked to Tyler's testimony that he discussed the Black-Barrett relationship with Petitioner and his family,

14

and pointed out that "neither the defendant nor his family sought representation elsewhere and continued to employ Mr. Tyler as the attorney for the defendant.  As a matter of fact, Mr. Tyler testified that he and the defendant had a prior established professional relationship in that Mr. Tyler had previously represented the defendant in a domestic relations matter as well as a misdemeanor criminal matter.  (Id. at 105).  All things considered, the trial court found Tyler had no conflict of interest.  (Id. at 103-05).

The Arkansas Court of Appeals agreed.  The Court of Appeals considered Rules 1.7 and 1.10 of the Arkansas Rules of Professional Conduct and Tyler's testimony at the Rule 37 hearing, and found no clear error in the trial court's conclusion  that Tyler had no conflict of interest under Rule 1.10(a).  Green v. State, 2020 Ark. App. at 12-13.

Here, Petitioner maintains that under Mickens v. Taylor and Cuyler v. Sullivan, Tyler had an actual conflict of interest affecting the adequacy of representation because (1) Tyler had conflicting loyalties; (2) Tyler had a significant risk that his representation of Petitioner would be limited because Barrett and Tyler is a two-man operation where no "Chinese wall" could be imposed; and (3) there was an appearance of impropriety that made Tyler's representation of Petitioner unlawful.  (Doc. No. 1 at 4-8).

As set out above, the Arkansas Court of Appeals interpreted the Arkansas Rules of Professional Conduct and found no conflict existed.  It is not for this Court to review the Arkansas Court of Appeals' interpretation of the Arkansas Rules of Professional Conduct.  See Middleton v. Roper, 455 F.3d 838, 852 (8th Cir. 2006).

While Petitioner argues his claim under Mickens and Cuyler, neither case supports a grant of relief in this case.  Again, "[t]o prove a conflict produced an adverse effect [under *Cuyler*], a defendant must identify a plausible alternative defense strategy or tactic that defense counsel might

have pursued, show that the alternate strategy was objectively reasonable under the facts of the case, and establish that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict." Ludwick, 761 F.3d at 846.

In the pretrial proceedings held on February 27, 2017, Tyler brought a motion in limine as to any State witness testifying as to their opinion as to truthfulness. (Doc. No. 7-2 at 52:12-53:6). The Court agreed that "no one can testify that someone is definitely telling the truth or not telling the truth." (Id. at 53:3-6). Tyler also unsuccessfully sought to keep evidence of alleged crimes pending against his client off the record. (Id. at 53:16-54:3). Further, Tyler argued that "[a]nything the alleged victim told to them would certainly be hearsay unless it falls under an exception, so we object to any potential outcry witnesses being called." (Id. at 54:4-7). Counsel was instructed to approach the bench before proceeding with questions that would involve responses including potential hearsay. (Id. at 55:2-9). Tyler also contested the prosecution's motion in limine. (Id. at 55:19-59:10).

At trial, Tyler stipulated to a video of the victim's CAC interview being introduced, along with a video of the victim's recantation. (Doc. No. 7-2 at 134:12-135:4). Tyler crossed examined K.B.'s mother, drawing attention to the recantation as recorded in the video, as well as in a note written by K.B.'s mother. (Id. at 159:9-160:7). Tyler also questioned K.B.'s mother about her relationship with K.B., pointing out that she had more issues with K.B. over the years than with the other children. (Id. at 160:17-22).

During Tyler's cross examination of Halbrook, Tyler asked her numerous questions attacking the statistics she cited during direct. (Id. at 203:25-206:14). For example:

| Tyler: | Now let me back up. Let's say we have 85 percent that recant and then the 15 percent that don't. So we have 100 percent, right? |
|---|---|
| Halbrook: | Yes, sir. |

| Tyler: | What percentage of those child sexual abuse victims have actually been victimized? |
|---|---|
| Halbrook: | Well, that is – it's not my job to determine whether or not a child is telling the truth and – |
| Tyler: | If you don't know, ma'am, you can simply say I don't know. |
| Halbrook: | I don't know. |

(Id. at 206:1-11).

Tyler also sought testimony as to Halbrook's interviews with K.B.'s siblings; the defense objected based on relevancy and then hearsay.  (Id. at 206:15-209:11).  Tyler attempted to impeach Halbrook about her conclusion that K.B.'s mannerisms and demeanor were consistent with sexual abuse by pointing out that another individual had been acquitted despite Halbrook's testimony. (Doc. No. 7-2 at 209:16-210:6).  The prosecution objected, and the court sustained.  (Id. at 210:1-23).

When the defense presented its case, Tyler called Peek, the lawyer who recorded K.B.'s recantation, asking him details about the video.  (Id. at  306:10-310:25).  Tyler made multiple objections during the prosecution's cross of Peek.  (Id. at 313:12-13, 314:21-24, 315:24-316:2, 316:19-20).

Petitioner alleges Tyler was ineffective for failing to object to testimony offered by Halbrook and K.B, failing to present testimony regarding K.B.'s source, and failing to object to improper impeachment of a defense witness.   Petitioner's argument appears not so much to be "an accusation that [Tyler] failed to pursue an alternative defense strategy, but that he did not pursue [Petitioner's] desired strategy," as now presented in this habeas action, to Petitioner's satisfaction. United States v. DeCologero, 530 F.3d 36, 77 (1st Cir. 2008).  Further, Petitioner did not establish that any alleged failure to pursue an alternative strategy was linked to the alleged

conflict: the chance of "probably" antagonizing Tyler's law partner is the type of division of loyalties that the Supreme Court has said is not enough to establish an actual conflict.  As such, Petitioner has not established adverse impact under Cuyler—and he cannot prove prejudice under Strickland's more rigorous standard.  Winfield v. Roper, 460 F.3d 1026, 1040 (8th Cir. 2006).

The Arkansas Court of Appeals' opinion is not an unreasonable application of Strickland.  Even if Tyler's representation was constitutionally deficient, Petitioner failed to establish prejudice.  Strickland, 466 U.S. at 687; Winfield v. Roper, 460 F.3d 1026, 1033 (8th Cir. 2006).  To show prejudice, a Petitioner must establish that there is a reasonable probability that but-for counsel's ineffectiveness, Petitioner would have achieved a more favorable result in the state court proceedings.  Id. at 690-91.  By reasonable probability, the law means probability "sufficient to undermine confidence in the outcome."  Wiggins v. Smith, 539 U.S. 510, 534 (2003).  Such probability is lacking here.

### B.    Halbrook Testimony

At the Rule 37 hearing, Tyler acknowledged that he did not file "any sort of Daubert motion or any other challenge saying [he does not] think [Halbrook] is an expert."  (Doc. No. 7-7 at 139:22-130:2).  Rather, Tyler stipulated to Halbrook's expertise.  (Id. at 140:3-4).  Tyler went on to testify that he had encountered Halbrook personally in his cases approximately four to five times.  (Id. at 140:11-22).  Tyler also was familiar with Halbrook through other defense attorneys and numerous trials, and Tyler had "never seen one time where [Halbrook] did not qualify as an expert in forensic interviewing."  (Id. at 140:18-22).  Tyler explained:

> Your Honor, the last thing I wanted was for her to get up there and spout off her qualifications for thirty minutes in front of that jury.  So I wanted to skip that step so we could get right to what she was going to testify to.  I did not want to hear how qualified she was because I knew she was going to be qualified as an expert.

(Id. at 141:1-7).  Tyler had reviewed Halbrook's CV or resume before determining not to object to her qualifications.  (Id. at 143:15-24).  Tyler further explained that the trial judge had received Halbrook as an expert on numerous occasions.  (Doc. No. 7-7 at 141:8-13).

Petitioner argues not only that Tyler was ineffective for failing to challenge Halbrook generally as an expert, but also for failing to object to testimony that arguably went beyond the scope of a forensic interviewer—for example, that a child's statement is consistent with a child who has been sexually abused.  (Id. at 144:1-146:19).  But Tyler did attempt to impeach Halbrook on this point.  (Doc. No. 7-2 at 209:16-210:25).

Petitioner also challenged Tyler's effectiveness for not objecting in connection with the statistics Halbrook used at trial.  Tyler testified at the Rule 37 hearing that he thought the statistics were ridiculous.  (Doc. No. 7-7 at 153:22-157:13).   He explained that his

> whole point with the statistics was [he] thought they were ridiculous.  And that's why [he] went into that testimony about what are the statistics on children who have actually been sexually abused because there is no way to know that.  There is no way to know who is telling the truth or not.  That's the point [he] was trying to get across to the jury.

(Id. at 156:24-157:4).  Tyler conceded that he did not ask Halbrook the source from which she obtained her statistics.  (Id. at 157:8-13).

As set out above, the trial court and Arkansas Court of Appeals found Tyler's decisions regarding Halbrook to be strategic.  The record contains facts that support the Arkansas court's findings.  Burt v. Titlow, 571 U.S. 12, 18-20 (2013).  As Strickland expressed, this type of strategic choice is "virtually unchallengeable."  Strickland, 466 U.S. at 690-91.  Accordingly, due deference is appropriate and Petitioner is not entitled to relief based on this claim.

### C.     Failure to Object to Outcry Witnesses and to Seek Limiting Instruction

Petitioner maintains Tyler was ineffective because he failed to object to the testimony of prosecution witnesses Ky. B. and D.H.  (Doc. No. 1 at 14-15).  Each of the witnesses testified before the victim did, and each claimed the victim expressed that she had been abused by Petitioner.  Petitioner asserts the testimony was not admissible as an excited utterance or prior inconsistent statement.  (Id. at 14-17).  Petitioner further asserts that to the extent the testimony was not offered for the truth of the matter presented, Tyler failed to seek a limiting instruction. (Id. at 17).

At the Rule 37 hearing, Tyler testified that he believed the testimony to be an excited utterance.  (Doc. No. 7-7 at 210:24-211:20).  The lower court and Arkansas Court of Appeals each found Tyler's decisions to be strategic.  Green v. State, 2020 Ark. App. at 17-18. There is evidence in the record to support this finding.  As such, the finding of the Arkansas courts is entitled to deference.

### D.     Failure to Object to Improper Impeachment of Defense Witness

According to Petitioner, Tyler was ineffective for not objecting when the prosecution cross examined Peek and asserted that "attorneys were mandated reporters and thus that Peek had violated the law by failing to report the allegations of abuse."  (Doc. No. 1 at 18).

Tyler testified at the Rule 37 hearing that he thought he had objected.  The record proved otherwise.  The Arkansas Court of Appeals affirmed after the lower court found Tyler's related decisions to be trial strategy and not prejudicial.  Green v. State, 2020 Ark. App. at 19.

This Court cannot say, based on the record before it, that the Arkansas courts' finding of fact or application of the law was unreasonable.  Accordingly, the Arkansas Court of Appeals decision is entitled to deference.

### E.   Failure to Present Testimony On Victim's Source of Original Claim of Abuse

Petitioner points out that after the victim recanted her allegations of abuse, K.H. had come to live with the victim and her family.  (Doc. No. 1 at 19).  K.H. also had accused her stepfather (not Petitioner) of sexual abuse.  Tyler did not ask the victim about it, but waited under Petitioner testified to raise this issue.  The trial court would not allow further testimony on the subject because Tyler had not questioned the victim about it.  Petitioner maintains he was deprived of a plausible explanation about why the accusation against him was made, and that there is a reasonable probability that the outcome of the case would have been different if this line of questioning had been allowed.  (Id. at 20).

Tyler testified during the Rule 37 hearing that after the judge told him that he should have asked the victim about this point, Tyler decided not to attempt to call the victim back to the stand to ask her about the origin of her renewed allegations.  (Doc. No. 7-7 at 174:13-15).

The lower court found Tyler's decision to be strategic, and the Arkansas Court of Appeals agreed.  Green v. State, 2020 Ark. App. at 19-21.  There are facts in the record to support that conclusion.  Again, this Court cannot say, based on the record before it, that the Arkansas courts' finding of fact or application of the law was unreasonable.  Accordingly, the Arkansas Court of Appeals decision is entitled to deference.

## IV.   CONCLUSION

IT IS, THEREFORE, RECOMMENDED that:

1.   Petitioner's § 2254 Petition for Writ of Habeas Corpus (Doc. No. 1) be DISMISSED with prejudice.

2.   A certificate of appealability not be issued.

DATED this 22nd day of June, 2022.

_____
JEROME T. KEARNEY
UNITED STATES MAGISTRATE JUDGE